UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| ELIEZER MORENO-VIGO, | : | |
| | : | |
| Plaintiffs | : | No. 1:14-CV-02229 |
| | : | |
| vs. | : | (Judge Kane) |
| | : | |
| LT. BERKIHISER, et al., | : | |
| | : | |
| Defendants | : | |


**MEMORANDUM**


I.   **Background**

On November 24, 2014, Plaintiff Eliezer Moreno-Vigo, an inmate incarcerated at the United States Penitentiary at Lee, Jonesville, Virginia ("USP-Lee"),[1] filed a 6-page complaint pursuant to 28 U.S.C. § 1331 and Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1977).[2] Doc. 1, Complaint, 1-6.  In the complaint, Moreno-Vigo alleges

_____

1.   Moreno-Vigo is presently incarcerated at the United States Penitentiary, Lewisburg, Pennsylvania ("USP-Lewisburg"), serving a sentence of life imprisonment for conspiracy to distribute narcotics imposed by the United States District Court for the District of Puerto Rico.

2.   28 U.S.C. § 1331 states as follows: "The district court shall have original jurisdiction of all actions arising under the Constitution, laws, or treaties of the United States."

Bivens stands for the proposition that "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal question jurisdiction of the district court to obtain an award of monetary damages against the responsible federal official." Butz v. Economou, 438 U.S. 478, 504 (1978).

that, while housed at the United States Penitentiary at Allenwood, White Deer, Pennsylvania, ("USP-Allenwood"), he was transported on November 20, 2013, to and from an outside medical appointment. Id. Moreno-Vigo contends that after completing his medical appointment he fell while entering the transport van and sustained injuries as the result of the negligence of an escorting correctional officer. Id. Moreno-Vigo further contends that a physician assistant who subsequently provided medical treatment was negligent. Id. Moreno-Vigo names the following two individuals employed at USP-Allenwood as defendants: (1) Jason Berkihiser, Lieutenant, and (2) "Mrs. Elmore," a physician assistant. Id.

Moreno-Vigo's specific claims are set forth on a form civil rights complaint which are routinely provided to pro se litigants.  The following is Moreno-Vigo's Statement of Claim in toto, including the spelling and grammatical errors:

> CLAIM 1: Lt. Berkihiser has completely failed by not providing the above mentioned plaintiff, Mr. Eliezer Moreno-Vigo; with any type of help or assistance to climb or enter the transportation van, and as a result the plaintiff fell and sustain injuries to his head and knees, on November 20th, 2013, which clearly shows that Lt. Berkihiser, was negligent by not providing a hand or by not helping this plaintiff, while being under Lt. Berkihiser's, custody on his recent medical trip, where plaintiff as a result sustained the above injuries he received while climbing the transportation van.

> CLAIM 2: PA, Mrs. Elmore, was also completely negligent; by not even checking my injuries; I sustain or received while being on my medical trip, to the outside hospital on that date of November 20, 2013.

> All PA. Mr. Elmore, did was come over, and look at me and told me to wash my head injury with soap and water, and made no other effort to give me other type of

medical attention.

> At 5:00 PM. While, PA. Mrs. Elmore, was conducting her pill line in the unit, I once again asked her for some type of help explaining that I had a brutal headache from my head injury, she simply tells me to order some Tylenol from the commissary or to fill out a sick call slip for the next day, once again PA Mrs. Elmore, did not provide me with any type of medical assistance with my injuries or medical needs, which violated my rights under the eighth amendment to medical care and attention, by medical at U.S.P. Allenwood.

Id. at 3-4.  As relief, Moreno-Vigo requests injunctive relief[3] and compensatory damages in the amount of $100,000  Id. at 5.

Along with the complaint Moreno-Vigo filed a motion for leave to proceed in forma pauperis. Doc. 2.  The motion to proceed

---

3.  Moreno-Vigo requests that the court issue an order directing prison officials who transport inmates to take certain actions to protect inmates but does not specify those actions. It is well recognized that the adjudicatory power of a federal court depends upon the continuing existence of a live and acute controversy. Steffel v. Thompson, 415 U.S. 452, 459 (1974) (emphasis in original).  "The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." Id. at n.10.  "Past exposure to illegal conduct is insufficient to sustain a present case or controversy regarding injunctive relief if unaccompanied by continuing, present adverse effects." Rosenberg v. Meese, 622 F. Supp. 1451, 1462 (S.D. NY 1985) (citations omitted). Furthermore, "[a]bsent class certification, an inmate's claim for injunctive and declaratory relief in a civil rights action fails to present a case or controversy once the inmate has been transferred." Wahl v. McIver, 773 F.2d 1169, 1173 (11th Cir. 1985) (citation omitted).  Consequently, since Moreno-Vigo is not suffering any apparent continuing adverse effects as a result of his prior confinement at USP-Allenwood, his requests for injunctive relief is moot under the standards set forth in Rosenberg and Wahl.  The claim for injunctive relief will be dismissed.

3

in forma pauperis was granted, waiver of service forms were sent
to the defendants and each defendant returned a waiver of service
form. Docs. 9, 10, 11 12 and 13.  After being granted two
extensions of time, defendants filed a motion to dismiss and/or
for summary judgment in lieu of an answer. Docs. 14, 15 and 16.
On April 29, 2015, defendants filed a supporting brief and a
statement of material facts in accordance with Local Rules 7.4,
7.5 and 56.1.  The defendants statement of material facts consists
of 135 paragraphs. Doc. 18.  In addition to the statement of
material facts the defendants submitted evidentiary materials,
including declarations under penalty of perjury from the
defendants, Berkihiser and Elmore,[4] and Brian Buschman, M.D., a
medical officer at USP-Allenwood, along with Moreno-Vigo's prison
medical records from November, 2013, and photographs of the top of
Moreno-Vigo's head and knees on the date of the incident.

On September 4, 2015, the court issued an order which,
inter alia, directed Moreno-Vigo within twenty-one (21) days to
show cause why defendants' motion to dismiss should not be
granted. Doc. 20.  On October 19, 2015, Moreno-Vigo filed a notice
of change of address and on October 20, 2015, a motion for
extension of time to respond to defendants' motion.  By order of

---

4.  Defendant Elmore's declaration reveals that her full name is
Jasmine Elmore and at the time of the incident she was an
Emergency Medical Technician - Paramedic at USP-Allenwood. Doc.
18, Declaration of AHSA Jasmine Elmore, at 41.  Defendant Elmore
is presently employed as an Assistant Health Services
Administrator at USP-Lewisburg. Id.

October 22, 2015, Moreno-Vigo was granted an extension of time until November 15, 2015. Doc. 23.  On November 9, 2015, Moreno-Vigo filed a second motion for extension of time. Doc. 24.  On November 16, 2015, the court granted Moreno-Vigo an extension of time until December 16, 2015, to file an opposition brief, a response to defendants' statement of material facts and any evidentiary materials. Doc. 25. Moreno-Vigo was further advised that failure to comply with the order would result in his complaint being dismissed for failure to prosecute and abide by a court order. Id.

On December 9, 2015, Moreno-Vigo filed a document entitled "Memo In Response to Defendants' Brief of Motion to Dismiss and/or, in the Alternative, for Summary Judgment" which the court construes as Moreno-Vigo's brief in opposition. Doc. 27. However, Moreno-Vigo did not file a separate response to defendants' statement of material facts in accordance with Local Rule 56.1.[5]  Furthermore, although Moreno-Vigo at the end of his

---

5.  Local Rule 56.1 states as follows:

> A motion for summary judgment filed pursuant to Fed.R.Civ.P. 56, shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.

> The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraph set forth in the statement required in the foregoing paragraph; as to which it is contended that
>                                                   (continued...)

brief stated "I declare under penalty of perjury that the foregoing is true and correct" he did not file any separate evidentiary materials.  Doc. 27, at 8.

Defendants in their brief in support of the motion to dismiss and/or for summary judgment make the following arguments:

1) The court should dismiss the complaint or grant summary judgment because Moreno-Vigo failed to properly exhaust administrative remedies;

2) the court should dismiss any official capacity claims because they are barred by the doctrine of sovereign immunity;[6]

---

5.  (...continued)
there exists a genuine issue to be tried.

Statement of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.

All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

M.D. Pa. LR 56.1 (emphasis added).  A standard practice order was issued on November 24, 2014, which advised Moreno-Vigo of the requirements of several Local Rules of Court, including Local Rule 56.1. Doc. 7.


6.  Moreno-Vigo is suing each defendant in both the defendant's individual and official capacity.  The Federal Government and its agencies are not subject to suit absent a waiver of sovereign immunity. See FDIC v. Meyer, 510 U.S. 471, 483 (1994); Kentucky v. Graham, 473 U.S. 159, 166 (1985); Jaffe v. United States, 592 F.2d 712, 717 (3d Cir. 1979). Although Bivens recognizes a personal-capacity cause of action for damages against federal officials for violation of rights protected by the United States Constitution, Bivens does not operate as a waiver of sovereign immunity for actions against the United States and its agencies.
(continued...)

> 3) the court should dismiss the complaint and/or grant summary judgment to Defendant Berkihiser because Moreno-Vigo fails to state a claim, and the record does not support a failure to protect claim; and
>
> 4) the court should dismiss the complaint and/or grant summary judgment to Defendant Elmore because Moreno-Vigo fails to state a claim, and the record does not support a failure to protect claim.

Doc. 19, Defendants' Brief.  The defendants' motion is ripe for disposition.  For the reasons set forth below, the court will grant summary judgment in favor of the defendants.

## II.  Summary Judgment

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that

---

6.  (...continued)
Id. An action for damages under Bivens may not be maintained against the United States or its agencies and a suit against a federal official for acts performed within his official capacity amounts to an action against the sovereign.  Id.  Thus, a Bivens action will lie only against named federal officers or agents in their personal, individual capacity.  Id.  Any claims for damages against defendants in their official capacity are barred by sovereign immunity because such claims are deemed to be claims against the Federal Government of its agencies.  Id. Consequently, Defendants' motion to dismiss as it relates to Moreno-Vigo's official capacity claims for damages will be granted.

there be no genuine issue of material fact." <u>Anderson v. Liberty</u>
<u>Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A disputed fact is "material" if proof of its existence
or nonexistence would affect the outcome of the case under
applicable substantive law. <u>Anderson</u>, 477 U.S. at 248; <u>Gray v.</u>
<u>York Newspapers, Inc.</u>, 957 F.2d 1070, 1078 (3d Cir. 1992). An
issue of material fact is "genuine" if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party.
<u>Anderson</u>, 477 U.S. at 257; <u>Brenner v. Local 514, United</u>
<u>Brotherhood of Carpenters and Joiners of America</u>, 927 F.2d 1283,
1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of
material fact, the court must view the facts and all reasonable
inferences in favor of the nonmoving party. <u>Moore v. Tartler</u>, 986
F.2d 682 (3d Cir. 1993); <u>Clement v. Consolidated Rail Corporation</u>,
963 F.2d 599, 600 (3d Cir. 1992); <u>White v. Westinghouse Electric</u>
<u>Company</u>, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid
summary judgment, however, the nonmoving party may not rest on the
unsubstantiated allegations of his or her pleadings. When the
party seeking summary judgment satisfies its burden under Rule 56
of identifying evidence which demonstrates the absence of a
genuine issue of material fact, the nonmoving party is required by
Rule 56 to go beyond the pleadings with affidavits, depositions,
answers to interrogatories or the like in order to demonstrate
specific material facts which give rise to a genuine issue.

Celotex Corporation v. Catrett, 477 U.S. 317, 324 (1986).  The
party opposing the motion "must do more than simply show that
there is some metaphysical doubt as to the material facts."
Matsushita Electric Industrial Co. v. Zenith Radio, 475 U.S. 574,
586 (1986).  When Rule 56 shifts the burden of production to the
nonmoving party, that party must produce evidence to show the
existence of every element essential to its case which it bears
the burden of proving at trial, for "a complete failure of proof
concerning an essential element of the nonmoving party's case
necessarily renders all other facts immaterial."  Celotex, 477
U.S. at 323.  See Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d
Cir. 1992).

**III.   Statement of Facts**

        The defendants's statement of material facts, which is
supported by attached evidentiary materials, including defendants'
declarations and the medical records, consists of 135 paragraphs.
However, only two portions of the statement consisting of 29
paragraphs are relevant to the pending motion based on the
substantive law applicable to this case as will be explained
hereinafter.  The first relevant portion of the statement relating
to Defendant Berkihiser states as follows:

> 27. On November 20, 2013, Defendant Berkihiser was
> assigned to work as the Hospital Escort Lieutenant,
> and in that capacity, he was responsible for making
> sure that inmate trips to outside medical facilities
> were conducted in a safe and secure manner. (Ex. 2
> Berkihiser Decl. ¶2.)
>
> 28. On November 20, 2013, Defendant Berkihiser was in

charge of the overall trip and he directly supervised
two additional correctional service staff members,
Senior Officer Specialist Drew Wetzel and Senior Officer
Specialist Chris Probst. (Ex. 2, Berkihiser Decl. ¶ 4.)

29.  On November 20, 2013, Senior Officer Specialists
Wetzel and Probst provided security; one officer was
located in a chase vehicle and the other officer drove
the escort van. (Id.)

30.  On November 20, 2013, Defendant Berkihiser rode
in the front passenger seat of the escort van and the
inmate was placed in the rear secure area of the escort
van. (Id.)

31. Although Defendant Berkihiser does not recall the
exact time, he does recall taking Moreno-Vigo to a local
doctor's office for a medical visit on November 20, 2013
and that Moreno-Vigo was placed in full restraints (hand
restraints, leg restraints, a belly chain, and a black
box) prior to being placed in the escort van.
(Ex. 2, Berkihiser Decl. ¶ 5.)

32.  On November 20, 2013, Defendant Berkihiser was not
involved in placing Moreno-Vigo into the van prior
to departing the institution en route to the local
doctor's office (approximately twenty minutes away)
for a medical appointment. (Ex. 2, Berkihiser Decl.
¶ 6.)

33.  The trip to the doctor's office on November 20,
2013 occurred without incident. (Id.)

34.  At the conclusion of the medical appointment, at
approximately 3:20 p.m., on November 20, 2013, all four
individuals exited the doctor's office in order to
return to the institution, at which time Senior Officer
Probst and Defendant Berkihiser established perimeter
security (i.e., looking for outside threats, civilian
assistance for an escape attempt, etc.), while Senior
Officer Wetzel maintained physical control of
Moreno-Vigo. (Ex. 2. Berkihiser Decl. ¶ 7.)

35. Although Defendant Berkihiser did not observe
Moreno-Vigo entering the escort van prior to the return
trip to the institution on November 20, 2013, he
did hear a sound from the van which caused him to look
towards the van, and then observed that Moreno-Vigo was
on his knees inside the van.  (Ex. 2, Berkihiser Decl.
¶ 8.)

36.   Defendant Berkihiser was told that Moreno-Vigo had
tripped over his feet and fallen forward. (<u>Id.</u>)

37.   Defendants Berkihiser did not notice any injuries
to Moreno-Vigo, and although he did ask Moreno-Vigo if
he was okay, Defendant Berkihiser does not recall
Moreno-Vigo's response. (Ex. 2, Berkihiser Decl. ¶ 9.)

38.   Defendant Berkihiser knows that Moreno-Vigo did
not state that he needed immediate attention or that he
had a serious injury. (<u>Id.</u>)

39.   Based on his assessment of the situation on
November 30, 2013, Defendant Berkihiser directed the
other officers to get in their vehicles and return
to the institution.  (Ex. 2, Berkihiser Decl. ¶10.)

40.   When they arrived back at the institution on
November 20, 2013, Defendant Berkihiser noticed that
Moreno-Vigo had an open abrasion on the top of his
head and open abrasions to both of his knees, and
therefore, Defendant Berkihiser requested medical
staff to evaluate Moreno-Vigo and photographs were
taken of Moreno-Vigo's injuries (one photograph of
the top of the head and one photograph of his knees).
(Ex. 2, Berkihiser Decl. ¶ 11; Attach 1, Photographs.)

41.   Moreno-Vigo did not request Defendant Berkihiser to
help him into or out of the escort van, but if he had,
Defendant Berkihiser would have directed one of the
other two correctional services staff to render
Moreno-Vigo assistance. (Ex. 2, Berkihiser Decl.
¶ 13.)

42.   It is the usual practice for one of the officers
to maintain positive control over the inmate when
entering and exiting the escort van, and to the best
of Defendant Berkihiser's knowledge, Moreno-Vigo was
assisted by Senior Officer Wetzel as he entered and
exited the escort van.  (<u>Id.</u>)

The statement of facts goes on to indicate that Berkihiser

prepared two memoranda dated November 20, 2013, and March 10,

2014, regarding the incident.  The second relevant portion of the

statement of material facts addresses Defendant Elmore's

involvement in the incident as follows:

> 45.  At approximately 3:35 p.m., Defendant Elmore,
> Emergency Medical Technician - Paramedic ("EMT-P")
> evaluated Moreno-Vigo in the Receiving and Discharge
> area. (Ex. 3, Elmore Decl. ¶ 3; Attach. 1, Clinical
> Encounter, Nov. 20, 2013.)
>
> 46. During Defendant Elmore's evaluation of Moreno-Vigo
> on November 20, 2013, he refused to tell her his pain
> level and he did not make a statement. (Ex. 3, Elmore
> Decl. ¶ 4; Attach. 1, Clinical Encounter, Nov. 20,
> 2013.)
>
> 47.  During Defendant Elmore's evaluation of
> Moreno-Vigo on November 20, 2013, she noted that
> Moreno-Vigo's vital signs were within normal limits;
> that he walked with a steady gait; that he was awake,
> alert and oriented; that he did not have any shortness
> of breath; that his pulses were equal, strong and
> regular; that his skin was warm and dry; that Moreno-
> Vigo's pupils were equal, round and reactive to light;
> that Moreno-Vigo was not experiencing any difficulty
> breathing and Moreno-Vigo moved all of his extremities
> strongly and with purpose. (Ex. 3,Elmore Decl. ¶¶ 4-7;
> Attach. 1, Clinical Encounter.)
>
> 48.  Defendant Elmore also noted abrasions
> (approximately 2" long by 1" wide) on both of
> Moreno-Vigo's knees and a quarter-sized abrasion to
> the top of his forehead at his hairline. (Ex. 3, Elmore
> Decl. ¶¶ 6-8; Attach. 1, Clinical Encounter.)
>
> 49.  Defendant Elmore noted dried blood on Moreno-
> Vigo's abrasions, but no active bleeding or other
> trauma. (Id.)
>
> 50.  Defendant Elmore therefore assessed that Moreno-
> Vigo had minor abrasions, instructed Moreno-Vigo to
> keep all of the wounds clean with soap and water and
> to cover the areas with band aids that she provided him,
> and instructed him to follow up with Health Services

staff if any additional problems occurred. (Ex. 3, Elmore Decl. ¶ 9, Attach. 1, Clinical Encounter.)

51.   Finally, Defendant Elmore instructed Moreno-Vigo to follow up with Health Services staff immediately if there were any signs of head injury (i.e., nausea, vomiting, dizziness, visual disturbance, or severe headache). (Ex. 3, Elmore Decl. ¶ 9; Attach. 1, Clinical Encounter.)

52.   Moreno-Vigo was then released to return to his housing unit. (Ex. 2, Berkihiser Decl. ¶12)

53.   At the conclusion of her examination of Moreno-Vigo, Defendant Elmore entered her findings in Moreno-Vigo's Medical Record. (Ex. 3, Elmore Decl. ¶10; Attach. 1, Clinical Encounter.)

54.   Defendant Elmore also examined two photographs taken on November 20, 2013, which depict Moreno-Vigo's injuries.  (Ex. 3, Elmore Decl. ¶ 11; Attach. 2, Photographs, Nov, 20, 2013.)

55.   The November 20, 2013, photographs that depict Moreno-Vigo's injuries combined with Moreno-Vigo's medical records, indicate that Moreno-Vigo only sustained minor abrasions on November 20, 2013, as Defendant Elmore originally diagnosed. (Ex. 3, Elmore Decl. ¶ 11; Attach. 1, Clinical Encounter, Nov. 20, 2013; Attach 2, Photographs, Nov. 20, 2013.)[7]

56.   This was the only medical encounter Defendant Elmore had with Moreno-Vigo. (Ex. 3, Elmore Decl. ¶ 12.)

57.   Defendant Elmore does not recall speaking with Moreno-Vigo at "5:00 p.m. during pill line" on

_____

7.  Contained within the summary judgment record are black and white photocopies of the photographs.  Only one of those photocopies is of any value. Doc. 18-4, at 1. That photocopy of the photographs reveals that Moreno-Vigo sustained minor abrasions to his knees and no discernible injuries to the scalp or forehead although possibly a quarter-sized abrasion in the mid-scalp near the hairline where Moreno-Vigo's hair is thinning or cropped short.

November 20, 2013, and if she had done so, she would
have recorded the encounter in Moreno-Vigo's medical
record. (Ex. 3. Elmore, Decl. ¶13.)

The statement of material facts goes on to indicate that Moreno-
Vigo had an encounter on November 21, 2013, with a physician
assistant who is not named as a defendant in this action, at which
time Moreno-Vigo complained of head pain and then outlines
subsequent medical treatment which Moreno-Vigo received.

Moreno-Vigo's subsequent encounters with medical staff
are outlined in the declaration of Brian Buschman, M.D., a medical
officer at USP-Allenwood. Doc. 18-3.  Although Moreno-Vigo
reported headaches at some of these encounters, of significance
with respect to all of the encounters is the fact that the
physical and neurological findings were essentially normal. Id.
Furthermore, on December 5, 2013, medical staff ordered a CT scan
which was performed on or about December 19, 2013, and revealed
"no evidence of any intracranial injury or lesion or
abnormalities." Id. at 7, ¶ 15; Doc. 18-3, Attach. 1, Medical
Records, at 80, 144 & 146. Also, Dr. Buschman reviewed an MRI of
Moreno-Vigo's brain performed on December 19, 2013, and stated
that although it revealed "a few non-specific hyper intense areas,
these findings were neither clinically significant nor related to
a head injury" and "[i]n short, the MRI was unremarkable." Doc.
18-3, at 8, ¶17.  Although Moreno-Vigo reported headaches for a

14

period of time after the date of the incident, when he was transferred to USP-Lee, he was given a thorough examination by the clinical director on April 29, 2014, and during that examination, Moreno-Vigo denied having headaches and it was noted that the chronic headaches were now in remission. Id. at 13-15, ¶¶24-33.

As stated above Moreno-Vigo did not respond in a separate document to the numbered paragraphs set forth in defendants' statement of material facts or present any evidentiary materials other than his brief which he signed under penalty of perjury pursuant to 28 U.S.C. § 1746.  In that brief Moreno-Vigo indicates with respect to defendant Berkihiser that "Lt. Berkihiser was responsible for the overall trip."  Doc. 27, at 4. Moreno-Vigo also makes the following statement: "Your Honor I'll tell you why this occurred & why all the contradictions the Lt. & Officer were talking to one another by the side of the van.  The other officer was on his cell phone headed towards the chase vehicle. If the court can view their personal cell phone records and the phone provided to transport officer (if any) the court will find officer was on it at the time of the incident! If the court can retrieve the video surveillance tap (if any) from the Drs. Office the court will see Lt. Berkihiser and officer Wetzel standing there talking, seeing me fall, then laughing, and finally Lt. Berkihiser himself picking me up."  Id. at 7-8.  He also

states with respect to Defendant Elmore that if she had "done a proper and appropriate examination and not a visual one all the medications they have been given me could've been avoided.  They would have known exactly what was wrong. To examine me months later and several medications later is negligence on her behalf. It is apparent that this head injury triggered something because I didn't have these severe headaches prior to this." Id. at 6. Moreno-Vigo does not contravene the facts that when he exited the medical office in order to return to the institution, Senior Officer Probst and Defendant Berkihiser established perimeter security while Senior Officer Wetzel maintained physical control of him and that Senior Officer Wetzel was responsible for placing him in the back of the van.

**III.   Discussion**

A person seeking to recover damages under "Bivens" must satisfy three requirements; he must: (1) assert that a constitutionally protected right has been violated; (2) state a cause of action sufficient to invoke the general federal question jurisdiction of the district court; and (3) demonstrate why money damages are the appropriate form of relief.  See Muhammad v. Carlson, 739 F.2d 122, 123-4 (3d Cir. 1984).

Moreno-Vigo's complaint is based on the Cruel and Unusual Punishments Clause of the Eighth Amendment.  His claim against Defendant Berkihiser is premised on an assertion that

16

Defendant Berkihiser failed to protect him from the injury which he sustained when he apparently tripped getting into the prison van.  The claim against Defendant Elmore is also based on the Eighth Amendment but relates to the adequacy of the medical care provided to Moreno-Vigo.

Claims based upon the Cruel and Unusual Punishments Clause have both objective and subjective components. Wilson v. Seiter, 501 U.S. 294, 298 (1991)  Serious hardship to the prisoner is required to satisfy the Eighth Amendment's objective component. Id.  The subjective component is met if the person or persons causing the deprivation acted with "a sufficiently culpable state of mind".  Id.

With regard to the subjective component, to establish an Eighth Amendment claim, Moreno-Vigo must show that the prison official acted with "deliberate indifference" to a substantial risk of serious harm.  Farmer v. Brennan, 511 U.S. 825, 828 (1994) (citing Helling v. McKinney, 509 U.S. 25 (1993); Wilson v. Seiter, supra; Estelle v. Gamble, 429 U.S. 97 (1976)).  In other words, the official must know of and disregard an excessive risk to inmate health or safety.  Natale v. Camden County Corr. Facility, 318 F.3d at 582; Farmer, 511 U.S. at 837.

With respect to the failure to protect claim, the law relating to a correctional officer failing to prevent assaults by

17

other inmates is relevant.  In that context, a plaintiff must prove more than that he had a fight with another inmate, <u>see Beard v. Lockhart</u>, 716 F.2d 544, 545 (8th Cir. 1983).  Additionally, mere negligent conduct that leads to serious injury of a prisoner by a prisoner does not expose a prison official to liability. <u>Davidson v. Cannon</u>, 474 U.S. 344, 347-48 (1986). To succeed, a prisoner must show that: (1) he was incarcerated under conditions posing a substantial risk of serious harm; (2) the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists"; (3) the defendant actually drew this inference; and (4) the defendant deliberately disregarded the apparent risk. <u>Farmer</u>, 511 U.S. at 834-37.

     The court discerns no fact in the summary judgment record, even accepting the averments of fact in Moreno-Vigo's brief, from which a jury could reasonably conclude that Defendant Berkihiser is liable under prevailing standards.  Only two facts are in dispute, and neither is material under substantive law applicable to this case: the location of Defendant Berkihiser at the time of the incident and whether or not Moreno-Vigo asked Defendant Berkihiser for assistance.  Three correctional officers were assigned the task of transporting Moreno-Vigo to and from the outside medical office.  Each officer was assigned specific duties.  Senior Officer Specialist Wetzel was assigned the duty of having physical control over Moreno-Vigo and positioning him in

the back of the van. Assuming that Defendant Berkihiser was
present at the back of van and that Moreno-Vigo asked for
assistance, there are clearly no facts from which a jury could
reasonably conclude that Defendant Berkihiser drew an inference
that Moreno-Vigo was being subjected to a substantial risk of
serious harm by his failure to intervene.  At most the allegations
suggest mere negligence on the part of Berkihiser which is
insufficient to sustain a cause of action under the Eighth
Amendment.

Likewise, there is no record evidence from which a jury
could reasonably conclude that Moreno-Vigo suffered a serious
medical need (Moreno-Vigo sustained minor abrasions to the scalp
and knees) or that Defendant Elmore was deliberately indifferent.

The objective component of an Eighth Amendment medical
care claim, i.e., whether a plaintiff's medical needs were
serious, has its roots in contemporary standards of decency.
Hudson v. McMillian, 503 U.S. 1 (1992).  "A medical need is
serious if it is one that has been diagnosed by a physician as
[mandating] treatment or one that is so obvious that even a lay
person would easily recognize the necessity for a doctor's
attention." Johnson v. Busby, 953 F.2d 349, 351 (8th Cir. 1991);
Monmouth County Correctional Institution Inmates v. Lanzaro, 834
F.2d 326, 347 (3d Cir.  1987); accord Ramos v. Lamm, 639 F.2d 559,
575 (10th Cir. 1980), cert. denied, 450 U.S. 1041 (1981); West v.

<u>Keve</u>, 571 F.2d 158, 162-63 n.6 (3d Cir. 1978).  The serious medical need element contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain.  <u>See</u> <u>Monmouth County Correctional Institution Inmates v. Lanzaro</u>, 834 F.2d at 347; <u>Archer v. Dutcher</u>, 733 F.2d 14, 16-17 (2d Cir. 1984); <u>Todaro v. Ward</u>, 565 F.2d 48, 52 (2d Cir. 1977). The Court of Appeals for the Third Circuit has held that not every injury or illness enjoys constitutional protection; only serious medical problems are actionable.  <u>See</u> <u>West v. Keve</u>, 571 F.2d at 161.  In fact courts have indicated that minor abrasions even involving associated bleeding do not rise to the level of an objectively serious medical need.  <u>See</u> <u>Wisneski v. Denning</u>, 2014 WL 1758118, *22 (W.D.Pa. April 30, 2014) and cases cited therein.

Even if the court assumes that Moreno-Vigo's medical need was serious in the constitutional sense, the summary judgment record reveals that he received medical attention.  At best, Moreno-Vigo's complaint and averments in his brief demonstrate his disagreement with the scope and extent of treatment by Defendant Elmore, the attending medical professional.  Moreno-Vigo's disagreement with the course of treatment, however, does not serve as a predicate to liability.  <u>See</u>, <u>White v. Napoleon</u>, 897 F.2d at 108-110(No deliberate indifference claim is stated when a doctor disagrees with the professional judgment of another doctor since "[t]here may, for example, be several acceptable ways to treat an

illness."); <u>Inmates of Allegheny County Jail v. Pierce</u>, 612 F.2d
at 762(claim for deliberate indifference does not arise just
because one doctor disagrees with the diagnosis of another).

When an inmate is provided with medical care and the
dispute is over the adequacy of that care, no Eighth Amendment
claim exists. <u>White v. Napoleon</u>, 897 F.2d 103, 108-10 (3d Cir.
1990). "A medical decision not to order an X-ray, or like
measures, does not represent cruel and unusual punishment. At
most it is medical malpractice...." <u>Estelle</u>, 429 U.S. at 107. A
mere difference of opinion between the inmate and the prison's
medical staff regarding the diagnosis or treatment that the inmate
receives does not support a claim of cruel and unusual punishment.
See <u>McFadden v. Lehman</u>, 968 F. Supp. 1001 (M.D. Pa. 1997); <u>Young
v. Quinlan</u>, 960 F.2d 351, 358 n.18 (3d Cir. 1992). The key
question is whether the defendant has provided the plaintiff with
some type of treatment, despite whether it is what the plaintiff
wants. <u>Farmer v. Carlson</u>, 685 F. Supp. 1335, 1339 (M.D. pa. 1988).

The facts establish efforts by the Defendant Elmore to
provide Moreno-Vigo with necessary medical care, and an attendant
mental state that falls short of deliberate indifference.

A reasonable fact finder could not conclude that
defendants acted with deliberate indifference to Moreno-

21

Vigo's safety. Therefore, the Court will grant defendants' motion for summary judgment.[8]

      An appropriate order will be entered.

---

8.  Before a plaintiff brings an action in this court he must exhaust all available administrative remedies. Moreno-Vega submitted an appeal to the Central Office of the Bureau of Prisons.  That appeal was rejected on April 16, 2014, because Moreno-Vega did not submit four carbonized copies of the request or appeal form.  The Central Office instructed Moreno-Vigo to resubmit his appeal in proper form within 15 days of the rejection notice, but he failed to do so.  This failure is a sufficient basis to conclude that Moreno-Vigo failed to exhaust administrative remedies.  Although Moreno-Vigo in his opposition brief states that he was transferred to the United States Penitentiary at Lee, Jonesville, Virginia ("USP-Lee"), on April 17, 2014 and his mail did not catch up with him until four to six weeks later and that he spoke to his counselor at USP-Lee and was told by the counselor to file an action in court, documentation attached to Moreno-Vigo complaint reveals that the notice from the Central Office was sent directly to Moreno-Vigo at USP-Lee on April 16, 2014. Doc. 1-1, at 5. Consequently, in the alternative Moreno-Vigo's complaint is subject to dismissal for failing to exhaust administrative remedies.